1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KEVIN RODGERS,

11              Plaintiff,               No. CIV S-07-2269 WBS DAD P

12        vs.

13   JAMES TILTON, et al.,

14              Defendants.              FINDINGS AND RECOMMENDATIONS

15   _____/

16              Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking

17   relief under 42 U.S.C. § 1983.  This matter is before the court on a motion for summary

18   judgment brought on behalf of defendant Athanassious pursuant to Rule 56 of the Federal Rules

19   of Civil Procedure.  Plaintiff has filed an opposition to the motion.  Defendant has filed a reply.

20                              **BACKGROUND**

21              Plaintiff is proceeding on his original complaint against defendants Athanassious

22   and Pettigrew.[1]  Therein, plaintiff alleges as follows.  On August 18, 2006, defendant Pettigrew

23   opened the door to Dorm 3 and asked plaintiff if he needed medication either because plaintiff

24   _____

25        [1] In his original complaint, plaintiff also alleged that defendants Moreno, Whitten, and
     Wyant violated his constitutional rights.  However, on January 26, 2010, the court dismissed
26   these defendants because it determined that plaintiff failed to exhaust his administrative remedies
     prior to filing suit with respect to his claims against them.

had been dropped on his head or had taken some kind of drugs prior to being incarcerated.
Plaintiff approached the door and placed his hand on the door frame.  Defendant Pettigrew
slammed the door shut, pinning plaintiff's finger between the metal door and the door frame.
Plaintiff screamed in pain and told defendant Pettigrew that his finger was cut off and bleeding.
Defendant Pettigrew laughed until he saw plaintiff's blood pooled on the floor.  Defendant
Pettigrew then yelled "man down" and asked another inmate to retrieve a towel.  (Compl. at 11.)

Plaintiff was taken to the B-1 Clinic where defendant Dr. Athanassious attempted
to re-attach plaintiff's crushed and severed digit.  Defendant Dr. Athanassious stitched and
dressed plaintiff's finger and provided him with pain medication.  On August 31, 2006, plaintiff
had an appointment with defendant Dr. Athanassious to have the stitches removed and to treat his
pain and possible infection.  However, defendant Athanassious was not there, so Nurse Rubio
removed plaintiff's stitches.  Nurse Rubio informed plaintiff that his finger looked bad because it
was swollen and pus was coming from the wound.  Plaintiff's finger also smelled bad, and there
was dead tissue surrounding exposed bone.  Nurse Rubio asked the physician on duty to look at
plaintiff's finger.  That physician determined that plaintiff needed to be sent to an outside
hospital to have a specialist examine him.  Shortly thereafter, defendant Dr. Athanassious came
in and looked at plaintiff's finger.  He said that plaintiff should continue to change the dressing
on his finger and use benedyne soaks.  Defendant Dr. Athanassious also prescribed a stronger
antibiotic for plaintiff.  (Compl. at 20-21.)

On September 7, 2006, plaintiff went back to the B-1 Clinic because he was in
unbearable pain and believed that his infection was getting worse.  At that time plaintiff saw Dr.
Long who asked him why he was soaking his finger in benedyne.  Plaintiff told him that
defendant Dr. Athanassious had recommended that treatment.  Dr. Long told the nurse on duty to
soak plaintiff's finger in peroxide and admitted plaintiff to the G-1 Hospital.  (Compl. at 21.)

On September 8, 2006, plaintiff was unable to urinate, so Dr. Calvo ordered a
catheter for him.  Dr. Calvo also sent plaintiff to B-2 Surgery where defendant Dr. Athanassious

1  was ready to perform the catheterization procedure.  According to plaintiff, defendant Dr.

2  Athanassious grabbed plaintiff's penis and started to push the catheter in, but at some point he

3  met resistance because it would not go in any further.  Defendant Dr. Athanassious attempted to

4  force the catheter in as plaintiff screamed in pain, asking for the doctor to stop because he was

5  hurting plaintiff.  The medical technical assistant had to hold plaintiff down during this

6  procedure.  Plaintiff repeatedly asked defendant Dr. Athanassious to stop, but he kept shoving the

7  catheter further and told plaintiff to keep his mouth shut and that he was being a baby.  After

8  fifteen to twenty minutes the catheter was inserted, but plaintiff could barely move or stand.

9  When plaintiff returned to his room, he could not sit or lay down and moving was painful.

10 Plaintiff could only stand in his room in one place for nearly an hour until Dr. Calvo told a nurse

11 to remove his catheter.  Once the catheter was out, plaintiff began to bleed and continued to bleed

12 for three days thereafter.  (Compl. at 23-24.)

13        On the same day as the catheterization, plaintiff was rushed to Doctor's Hospital

14 to see a specialist with regard to his finger.  While at the hospital, medical personnel were unable

15 to bring his infection under control and informed plaintiff that they would need to amputate half

16 of his finger.  According to the specialist, the bone in plaintiff's finger could not be salvaged and

17 should have been amputated at the time of his injury.  Plaintiff stayed at Doctor's Hospital

18 receiving treatment until September 13, 2006.  (Compl. at 22.)

19        Plaintiff is proceeding against defendant Pettigrew on an Eighth Amendment

20 excessive use of force claim and against defendant Dr. Athanassious on an Eighth Amendment

21 inadequate medical care claim in connection with both the treatment of his finger injury and the

22 insertion of the catheter.

23               **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

24        Summary judgment is appropriate when it is demonstrated that there exists "no

25 genuine issue as to any material fact and that the moving party is entitled to a judgment as a

26 matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

1  return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

2  1436 (9th Cir. 1987).

3          In the endeavor to establish the existence of a factual dispute, the opposing party

4  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

5  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

6  versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

7  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

8  genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

9  committee's note on 1963 amendments).

10          In resolving the summary judgment motion, the court examines the pleadings,

11  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

12  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

13  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

14  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

15  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

16  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

17  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

18  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

19  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

20  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

21  'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

22                          **OTHER APPLICABLE LEGAL STANDARDS**

23  I.  Civil Rights Act Pursuant to 42 U.S.C. § 1983

24          The Civil Rights Act under which this action was filed provides as follows:

25          Every person who, under color of [state law] . . . subjects, or causes
           to be subjected, any citizen of the United States . . . to the
26          deprivation of any rights, privileges, or immunities secured by the

5

Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff.  See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made."  Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

Moreover, supervisory personnel are generally not liable under § 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory allegations concerning the involvement of official personnel in civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

II.  The Eighth Amendment and Inadequate Medical Care

The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986); Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976). In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

Where a prisoner's Eighth Amendment claims arise in the context of medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence

1   deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106.  An Eighth

2   Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need

3   and the nature of the defendant's response to that need." McGuckin v. Smith, 974 F.2d 1050,

4   1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133

5   (9th Cir. 1997) (en banc).

6          A medical need is serious "if the failure to treat the prisoner's condition could

7   result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

8   McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical

9   need include "the presence of a medical condition that significantly affects an individual's daily

10  activities." Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner

11  satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v.

12  Brennan, 511 U.S. 825, 834 (1994).

13         If a prisoner establishes the existence of a serious medical need, he must then

14  show that prison officials responded to the serious medical need with deliberate indifference.

15  Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials

16  deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in

17  which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94

18  (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard

19  to medical care, however, "the indifference to his medical needs must be substantial.  Mere

20  'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action."

21  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at

22  105-06).  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere

23  negligence in diagnosing or treating a medical condition, without more, does not violate a

24  prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate

25  indifference is "a state of mind more blameworthy than negligence" and "requires 'more than

26  ordinary lack of due care for the prisoner's interests or safety.'" Farmer, 511 U.S. at 835

1   (quoting Whitley, 475 U.S. at 319).

2         Delays in providing medical care may manifest deliberate indifference.  Estelle,

3   429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in

4   providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d

5   1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332,

6   1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v.

7   Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a]

8   prisoner need not show his harm was substantial; however, such would provide additional

9   support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett

10  v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

11        Finally, mere differences of opinion between a prisoner and prison medical staff

12  or between medical professionals as to the proper course of treatment for a medical condition do

13  not give rise to a § 1983 claim.  Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330,

14  332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662

15  F.2d 1337, 1344 (9th Cir. 1981).

16  **DEFENDANT ATHANASSIOUS' MOTION FOR SUMMARY JUDGMENT**

17  I.  Defendant Athanassious' Statement of Undisputed Facts and Evidence

18        Defendant Dr. Athanassious' statement of undisputed facts is supported by

19  citations to his own declaration signed under penalty of perjury and citations to plaintiff's

20  medical records.  It is also supported by references to copies of plaintiff's administrative appeals,

21  which are attached to defendants' previously-filed motion to dismiss.

22        The evidence submitted by defendant Dr. Athanassious establishes the following.

23  At all relevant times, defendant Athanassious was a licensed medical doctor assigned to

24  California Medical Facility ("CMF").  On August 18, 2006, plaintiff injured his left ring finger

25  when a door closed on it.  Dr. Pai examined plaintiff at the B-1 emergency room at CMF.  Dr.

26  Pai noted that plaintiff's finger had a deep cut and was actively bleeding.  He applied topical

1   lidocaine for discomfort and contacted defendant Athanassious, the chief of surgery at CMF.

2   (Def.'s SUDF 2-6, Exs. B & C.)

3           Plaintiff's finger was nearly amputated and needed to be sutured together.  The tip

4   of the finger had pink coloration, which indicated that it was still receiving a fresh blood supply.

5   After plaintiff gave his verbal and written consent for treatment, defendant Dr. Athanassious

6   applied a local anesthetic to numb the wound, cleaned and disinfected the wound, closed the

7   wound with nylon sutures, applied topical antibiotic to the wound, and placed the finger in a

8   surgical splint for protection.  Defendant Dr. Athanassious then placed plaintiff on antibiotics

9   and pain medication and referred him back to the treating physicians and medical staff in the B-1

10  emergency room.  Dr. Pai ordered the dressing on plaintiff's finger to be changed daily in the B-1

11  clinic with triple antibiotic ointment administered.  On the same day, Dr. McAllister increased

12  the dressing change orders to twice daily until September 1, 2006.  (Def.'s SUDF 7-13, Exs. B &

13  C.)

14          On August 24, 2006, Dr. Sanders examined plaintiff's finger and noted that there

15  was a "good chance [the] digit may heal well."  On August 21, 2006, August 24, 2006, and

16  August 30, 2006, plaintiff failed to come to the clinic for the ordered dressing changes.  On

17  September 1, 2006, Dr. Weiland examined plaintiff's finger and ordered plaintiff to soak his

18  finger daily in a solution consisting of 50 percent saline and 50 percent betadine for ten minutes

19  and then re-dress.  Dr. Weiland also ordered plaintiff to continue to wear a metal splint.  At that

20  appointment, Dr. Weiland consulted with defendant Dr. Athanassious and asked him to look at

21  plaintiff's finger.  At the time, plaintiff was not under defendant Dr. Athanassious' care.

22  Defendant Athanassious agreed with Dr. Weiland's order because it would help promote healing

23  of the incision.  (Def.'s SUDF 14-17, Exs. B & C.)

24          On September 1, 2006, September 5, 2006, and September 6, 2006, plaintiff failed

25  to come to the clinic for the ordered soakings and dressing changes.  On September 7, 2006, Dr.

26  Long examined plaintiff's finger and noted increased redness and swelling of the finger over the

previous few days.  While in the emergency room, plaintiff was seen removing the bandage on his finger and touching and pulling on the wound where there was tearing of the tissue.  (Def.'s SUDF 18-19, Ex. C.)

On September 7, 2006, Dr. Long referred plaintiff to defendant Dr. Athanassious for complaints of increasing redness and pain to the left ring finger.  The sutures had been removed, and the finger appeared infected.  Defendant Dr. Athanassious recommended to Dr. Long that plaintiff receive intravenous antibiotics and be admitted into the G-2 unit, an inpatient hospital unit at CMF.  On September 7, 2006, Dr. Long admitted plaintiff into the unit G hospital and ordered that plaintiff's bandage was to be applied by a nurse only; plaintiff was never to remove the bandage himself or touch the wound area.  Other than on August 18, 2006, September 1, 2006, and September 7, 2006, defendant Dr. Athanassious did not provide any additional care or treatment for plaintiff's finger.  (Def.'s SUDF 20-22, Exs. B & C.)

Plaintiff filed an administrative appeal, Log No. 06-1947, dated September 18, 2006, requesting that defendant Dr. Athanassious be "severely reprimanded" and that he receive monetary compensation for his injury due to defendant Athanassious' "negligence and malpractice."  Plaintiff's original inmate appeal makes no mention of defendant Dr. Athanassious' attempt to insert a catheter into plaintiff's penis or the alleged injury the defendant caused to his penis.  (Def.'s SUDF 23-24, Defs.' MTD Lewis Decl. Ex. 5.)

According to a declaration submitted by defendant Dr. Athanassious, his treatment of plaintiff at all times was within the community standard of care and was consistent with the degree of knowledge and skill ordinarily possessed and exercised by members of his profession under similar circumstances.  At no point in time did defendant Dr. Athanassious deny plaintiff treatment that was medically necessary or warranted.  Defendant Dr. Athanassious treated plaintiff appropriately for all of his medical complaints, and there was never an intentional or deliberate delay in providing him medical treatment.  Defendant Dr. Athanassious did not cause plaintiff medically unnecessary injury or undue pain or suffering.  Rather, he was at

1  all times motivated by genuine concern for plaintiff's health and well-being.  (Def.'s SUDF 25-

2  29, Ex. B.)

3  II.  Defendant Athanassious' Arguments

4          Defense counsel argues that defendant Dr. Athanassious is entitled to summary

5  judgment in his favor with respect to plaintiff's Eighth Amendment claim because there is no

6  evidence before the court indicating that the defendant Dr. Athanassious was deliberately

7  indifferent to plaintiff's medical needs.  Specifically, defense counsel contends that when

8  defendant Dr. Athanassious first saw plaintiff on August 18, 2006, for his injured finger, he

9  applied a local anesthetic to numb the wound, cleaned and disinfected the wound, closed the

10  wound with nylon sutures, applied topical antibiotic and placed the finger in a surgical splint for

11  protection.  Defendant Dr. Athanassious then prescribed plaintiff antibiotics and pain medication

12  and referred him back to the treating physicians.  On September 1, 2006, defendant Dr.

13  Athanassious agreed with Dr. Weiland's treatment plan which called for plaintiff to soak his

14  finger daily in a solution consisting of 50 percent saline and 50 percent betadine because it would

15  help promote healing of the incision.  Finally, on September 7, 2006, he recommended to Dr.

16  Long that he admit plaintiff to the prison's hospital and put him on intravenous antibiotics

17  because plaintiff's finger appeared to be infected.  Defense counsel contends that there is no

18  evidence before the court that defendant Dr. Athanassious intentionally or knowingly caused

19  plaintiff any pain, suffering, harm, or delayed care.  Alternatively, defense counsel contends that

20  defendant Dr. Athanassious is entitled to qualified immunity.  (Def.'s Mem. of P. & A. at 6-8,

21  11.)

22          Defense counsel also argues that plaintiff failed to exhaust his administrative

23  remedies prior to filing suit with respect to his Eighth Amendment inadequate medical care claim

24  in connection with defendant Dr. Athanassious' catheterization.  Defense counsel contends that

25  plaintiff filed two inmate grievances regarding the circumstances surrounding this case.  In the

26  first grievance, Log 06-01759, dated August 23, 2006, plaintiff requested that defendant

1   Pettigrew be disciplined for his "unprofessional conduct and gross negligence" in making fun of

2   plaintiff's mental health and for shutting the door on plaintiff's finger.  In the second inmate

3   grievance, Log 06-1947, dated September 18, 2006, plaintiff requested that defendant Dr.

4   Athanassious be "severely reprimanded" for his conduct and that plaintiff be compensated for his

5   injury due to defendant Dr. Athanassious' "negligence and malpractice."  Defense counsel

6   contends that plaintiff made no mention of defendant Dr. Athanassious' alleged attempt to insert

7   a catheter into plaintiff's penis.  In this regard, counsel maintains that prison officials have not

8   had an opportunity to address this aspect of plaintiff's inadequate medical care claim.  (Def.'s

9   Mem. of P. & A. at 8-11.)

10  III.  Plaintiff's Opposition

11          Plaintiff's opposition to defendant's motion for summary judgment is supported

12  by his own declaration signed under penalty of perjury.  It is also supported by copies of his

13  medical records, administrative inmate grievances, and defendant's responses to plaintiff's

14  discovery requests.

15          Plaintiff argues that defendant Dr. Athanassious intentionally delayed plaintiff's

16  access to essential medical care when he refused to refer plaintiff to an orthopedic specialist even

17  though plaintiff repeatedly requested the referral.  In plaintiff's view, defendant Athanassious

18  was his treating physician and was responsible for setting a course for treatment for plaintiff's

19  serious medical injury.  However, instead, defendant Dr. Athanassious provided plaintiff with

20  inadequate medical care causing plaintiff's finger to get infected.  (Pl.'s Mem. of P. & A. at 8-9

21  & Exs. C & E.)

22          Plaintiff also argues that he exhausted his administrative remedies prior to filing

23  suit with respect to his claim that defendant Dr. Athanassious was deliberately indifferent to

24  plaintiff's medical needs when he inserted the catheter.  Specifically, plaintiff argues that in Log

25  No. 06-1947, he described the catheter incident.  Plaintiff contends that he pursued that inmate

26  /////

1    appeal through the director's level of review and therefore exhausted the claim.  (Pl.'s Mem. of

2    P. & A. at 8-9 & Ex. F.)

3             Finally, plaintiff argues that defendant Dr. Athanassious is not entitled to qualified

4    immunity because the law regarding medical treatment of prisoners was clearly established at the

5    time of the incidents in this case.  (Pl.'s Mem. of P. & A. at 10-11.)

6    IV.  <u>Defendant Athanassious's Reply</u>

7             In reply, defense counsel reiterates that defendant Dr. Athanassious treated

8    plaintiff appropriately for all of his medical complaints.  Specifically, counsel argues that there is

9    no evidence that plaintiff needed to see an orthopedic surgeon or that he was seriously affected

10    by not seeing one.  In addition, defense counsel reiterates that plaintiff did not exhaust his

11    administrative remedies regarding his claim that defendant Dr. Athanassious wrongfully inserted

12    a catheter into plaintiff's penis.  As an initial matter, defense counsel objects to plaintiff's

13    submission to the court of the copy of his inmate appeal because, according to defense counsel,

14    plaintiff is not qualified to authenticate documents from his central file.  In any event, defense

15    counsel contends that the inmate appeal does not demonstrate that plaintiff properly exhausted

16    administrative remedies with respect to his catheterization claim because he only included

17    reference to that issue in his third level appeal at the director's level of review and not in the

18    original inmate appeal plaintiff filed.[2]  (Def.'s Reply at 4-6.)

19    /////

20

21          [2]  Defense counsel has objected to some of plaintiff's evidence submitted in support of his opposition to the pending motion for summary judgment such as plaintiff's copy of his inmate

22    appeal.  These objections are overruled.  It would be an abuse of this court's discretion to refuse to consider evidence offered by a pro se plaintiff at the summary judgment stage.  <u>See, e.g.</u>, <u>Jones</u>

23    <u>v. Blanas</u>, 393 F.3d 918, 935 (9th Cir. 2004) (reversing and remanding with instructions to consider evidence offered by the pro se plaintiff in his objections to the findings and

24    recommendations); <u>Fraser v. Goodale</u>, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (holding that the district court properly considered a diary which defendants moved to strike as inadmissible

25    hearsay because "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We focus instead on the admissibility of its contents."); <u>Johnson v. Meltzer</u>,

26    134 F.3d 1393, 1399-1340 (9th Cir. 1998) (reversing and remanding for consideration of the pro se plaintiff's verified motion as an affidavit in opposition to summary judgment).

**ANALYSIS**

As discussed above, defendant Dr. Athanassious moves for summary judgment in his favor on plaintiff's Eighth Amendment claim in connection with the treatment of his finger injury. Defendant Dr. Athanassious does so on the grounds that there is no evidence before the court that the defendant was deliberately indifferent to plaintiff's medical needs and, alternatively, that defendant Dr. Athanassious is entitled to qualified immunity. Defendant Athanassious also moves for summary judgment on plaintiff's Eighth Amendment claim in connection with the plaintiff's catheterization on the grounds that plaintiff failed to exhaust his administrative remedies on this claim prior to filing suit. The court will address both aspects of defendant's motion for summary judgment in turn.

I. Plaintiff's Eight Amendment Claim in Connection with His Finger Injury

As an initial matter, the parties do not appear to dispute and the undersigned concludes that based upon the evidence presented by the parties in connection with the pending motion a reasonable juror could conclude that plaintiff's finger injury constitutes an objective, serious medical need. See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment."); Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to provide medical care applies "to medical conditions that may result in pain and suffering which serve no legitimate penological purpose."). Specifically, plaintiff's largely undisputed medical history, as well as the observations and treatment recommendations by defendant Dr. Athanassious, Dr. Pai, Dr. McAllister, Dr. Sanders, Dr. Weiland, and Dr. Long compel the conclusion that plaintiff's medical condition, if left untreated, could result in "further significant injury" and the "unnecessary and wanton infliction of pain." McGuckin, 974 F.2d at 1059. Accordingly, resolution of defendant Dr. Athanassious' motion for

1  summary judgment hinges on whether, based upon the evidence before the court on summary

2  judgment, a rationale jury could conclude that the defendant responded to plaintiff's serious

3  medical needs with deliberate indifference.  See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at

4  106.

5          The court finds that defendant Dr. Athanassious has borne his initial responsibility

6  of demonstrating that there is no genuine issue of material fact with respect to the adequacy of

7  the medical care provided to plaintiff.  Specifically, defendant's evidence demonstrates that on

8  August 18, 2006, plaintiff injured his left ring finger when a door closed on it.  On three

9  occasions, defendant Dr. Athanassious provided care to plaintiff either directly or through

10 consultation.  First, on August 18, 2006, the defendant applied a local anesthetic to numb

11 plaintiff's wound, cleaned and disinfected the wound, closed the wound with nylon sutures,

12 applied topical antibiotic and placed plaintiff's finger in a surgical splint for protection.

13 Defendant Dr. Athanassious then prescribed antibiotics and pain medication for plaintiff and

14 referred him back to the treating physicians in the B-1 emergency room.  (Def.'s Exs. B & C.)

15          On September 1, 2006, plaintiff was not under defendant Dr. Athanassious' care.

16 However, Dr. Weiland had examined plaintiff's finger on that day and consulted with defendant

17 Dr. Athanassious, asking him to look at plaintiff's finger.  Dr. Weiland ordered plaintiff to soak

18 his finger daily in a solution consisting of 50 percent saline and 50 percent betadine for ten

19 minutes and then re-dress.  He also directed plaintiff to continue to wear a metal splint.

20 Defendant Dr. Athanassious agreed with Dr. Weiland's treatment order because he believed it

21 would help promote healing of the incision.  (Def.'s Exs. B & C.)

22          Finally, on September 7, 2006, Dr. Long examined plaintiff's finger and noted

23 increased redness and swelling of the finger over the previous few days.  Dr. Long referred

24 plaintiff to defendant Dr. Athanassious due to plaintiff's complaints of increasing redness and

25 pain to the left ring finger.  The sutures had been removed, and the finger appeared infected.

26 Defendant Dr. Athanassious recommended to Dr. Long that plaintiff receive intravenous

1   antibiotics and be admitted into the G-2 unit, an inpatient hospital unit at CMF.  On the same

2   day, Dr. Long admitted plaintiff into the unit G hospital and ordered that plaintiff's bandage be

3   placed only by a nurse and that plaintiff  never remove the bandage himself or touch the injured

4   area.  (Def.'s Exs. B & C.)

5           Given the evidence submitted by defendant Dr. Athanassious in support of the

6   pending motion for summary judgment, the burden shifts to plaintiff to establish the existence of

7   a genuine issue of material fact with respect to his inadequate medical care claims.  As noted

8   above, to demonstrate a genuine issue, the opposing party "must do more than simply show that

9   there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole

10  could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue

11  for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  Here, the court has considered

12  plaintiff's opposition to the pending motion for summary judgement and his verified complaint.

13  On defendant's motion for summary judgment, the court is required to believe plaintiff's

14  evidence and draw all reasonable inferences from the facts before the court in plaintiff's favor.

15  Drawing all reasonable inferences in plaintiff's favor, the court concludes that plaintiff has not

16  submitted sufficient evidence to create a genuine issue of material fact with respect to his claim

17  that the defendant responded to his serious medical needs with deliberate indifference.  See

18  Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

19          Specifically, plaintiff argues that defendant Dr. Athanassious was deliberately

20  indifferent to plaintiff's medical needs because he did not refer plaintiff to an orthopedic

21  specialist as plaintiff had requested.  However, as a matter of law, a mere difference of opinion

22  between a prisoner and prison medical staff as to the proper course of medical care does not give

23  rise to a § 1983 claim.  See Estelle, 429 U.S. at 107 ("A medical decision not to order an X-ray,

24  or like measures, does not constitute cruel and unusual punishment."); see also Fleming v.

25  Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D. Cal. 2006) ("Plaintiff's own opinion as to the

26  appropriate course of care does not create a triable issue of fact because he has not shown that he

16

has any medical training or expertise upon which to base such an opinion.").  Here, plaintiff has come forward with no evidence showing that the course of treatment defendant Dr. Athanassious chose was medically unacceptable under the circumstances or that defendant Dr. Athanassious chose the particular course of treatment employed in conscious disregard of an excessive risk to plaintiff's health.  Farmer, 511 U.S. at 837.  Plaintiff's mere disagreement with defendant Dr. Athanassious as to the appropriate course of treatment, without more, is insufficient to survive defendant's motion for summary judgment.

In addition, although medical staff at Doctors Medical Center ultimately amputated part of plaintiff's ring finger, this decision in and of itself does not necessarily suggest that the care administered by defendant Athanassious was medically unacceptable.  As an initial matter, it appears undisputed that plaintiff's finger had become infected by the time he was sent to Doctors Medical Center.  Accordingly, the medical staff at Doctors Medical Center was not treating plaintiff under the same conditions as confronted by defendant Dr. Athanassious.  Even assuming, as plaintiff alleges, that the staff at Doctor's Hospital told him "The bone in your finger could not be salvaged and should have been amputated at the time of [the] injury," such reflects only a difference of medical opinion between doctors, which also does not in and of itself give rise to a cognizable § 1983 claim.  See Toguchi, 391 F.3d at 1059-60 ("Dr. Tackett's contrary view was a difference of medical opinion, which cannot support a claim of deliberate indifference."); Sanchez, 891 F.2d at 242 (difference of opinion between medical personnel regarding the need for surgery does not amount to deliberate indifference to a prisoner's serious medical needs).

Moreover, even if defendant Dr. Athanassious should have referred plaintiff to an orthopedic surgeon before September 8, 2006, or should have amputated plaintiff's finger the day the injury took place instead of suturing it and trying to salvage it, at most, Dr. Athanassious' actions would constitute neglect or medical malpractice but not deliberate indifference in violation of the Eighth Amendment.  The Ninth Circuit has made clear that "[w]hile poor

17

1   medical treatment will at a certain point rise to the level of a constitutional violation, mere

2   malpractice, or even gross negligence does not suffice." Wood, 900 F.2d at 1234.  See also

3   McGuckin, 974 F.2d at 1060 ("A finding that the defendant's neglect was an 'isolated

4   occurrence' or an 'isolated exception,' . . . militates against a finding of deliberate indifference").

5          Finally, plaintiff has provided no evidence to show that any delay in his receiving

6   medical treatment or in being sent to see an orthopedic specialist caused him unnecessary and

7   wanton infliction of pain, significant harm, or permanent injury.  See Berry, 39 F.3d at 1057;

8   McGuckin, 974 F.2d at 1059; Wood, 900 F.2d at 1335; Hunt, 865 F.2d at 200; Shapley, 766 F.2d

9   at 407.  As an initial matter, plaintiff did not experience much delay, if any, in seeing a doctor for

10  treatment of his finger injury.  As noted above, the undisputed evidence establishes that plaintiff

11  saw defendant Dr. Athanassious and received extensive treatment on the very day he injured his

12  finger.  In the days and weeks thereafter, plaintiff also received medical treatment for his injury

13  from Dr. Pai, Dr. McAllister, Dr. Sanders, Dr. Weiland, and Dr. Long.  In between those medical

14  visits, plaintiff saw other medical personnel daily or even twice-daily for dressing changes and

15  betadine soakings.  In this regard, this is not a case where months passed before plaintiff received

16  any treatment.  See Hunt v. Dental Dep't, 865 F.2d 198 (9th Cir. 1989) (finding that a three-

17  month delay in replacing dentures causing gum disease and possibly weight loss could constitute

18  Eighth Amendment violation).  To the extent that plaintiff is claiming that he experienced

19  unreasonable delay in seeing an orthopedic specialist, plaintiff has not shown that he suffered any

20  substantial harm as a result of that claimed delay.  Although the evidence before the court

21  establishes that plaintiff developed an infection, plaintiff has not offered any evidence to indicate

22  that the infection was caused by a delay in him being sent to see an orthopedic surgeon.

23  Moreover, the doctors at CMF did not deny or delay plaintiff's medical care for his infection.

24  Rather, it is undisputed that defendant Dr. Athanassious specifically prescribed plaintiff

25  increasingly strong antibiotics and later recommended him for a higher level of inpatient care at

26  CMF.  In addition, CMF doctors subsequently transferred plaintiff to Doctor's Medical Center

1   where his infection resolved within 48 hours.  (Pl.'s Mem. of P. & A. Exs. A & B.)  Given the

2   undisputed evidence establishing the treatment plaintiff actually received for his injury, this court

3   must conclude that plaintiff has failed to present evidence that any perceived delay in his medical

4   treatment caused him substantial harm.

5               Accordingly, for all of the foregoing reasons, defendant Dr. Athanassious' motion

6   for summary judgment with respect to plaintiff's Eighth Amendment claim based upon the

7   medical treatment he received for his finger injury should be granted.[3]

8   II.  Plaintiff's Eight Amendment Claim in Connection with His Catheter Insertion

9               By the Prison Litigation Reform Act of 1995 ("PLRA"), Congress amended 42

10  U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions

11  under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail,

12  prison, or other correctional facility until such administrative remedies as are available are

13  exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement "applies to all inmate suits about

14  prison life, whether they involve general circumstances or particular episodes, and whether they

15  allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).

16              The United States Supreme Court has ruled that exhaustion of prison

17  administrative procedures is mandated regardless of the relief offered through such procedures.

18  Booth v. Churner, 532 U.S. 731, 741 (2001).  The Supreme Court has also cautioned against

19  reading futility or other exceptions into the statutory exhaustion requirement.  Id. at 741 n.6.

20  Moreover, because proper exhaustion is necessary, a prisoner cannot satisfy the PLRA

21  exhaustion requirement by filing an untimely or otherwise procedurally defective administrative

22  grievance or appeal.  Woodford v. Ngo, 548 U.S. 81, 90-93 (2006).

23  /////

24

25          [3]  The parties have also briefed the issue of whether defendant Dr. Athanassious is
    entitled to summary judgment in his favor based upon qualified immunity.  In light of the
    recommendation set forth above, however, the court will not reach the merits of those qualified
26  immunity arguments.

1    In California, prisoners may appeal "any policy, decision, action, condition, or

2  omission by the department or its staff that the inmate or parolee can demonstrate as having a

3  material adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, §

4  3084.1(a).  Most appeals progress through three levels of review.  See id. § 3084.7.  The third

5  level of review constitutes the decision of the Secretary of the California Department of

6  Corrections and Rehabilitation and exhausts a prisoner's administrative remedies.  See id. §

7  3084.7(d)(3).  A California prisoner is required to submit an inmate appeal at the appropriate

8  level and proceed to the highest level of review available before filing suit.  Butler v. Adams, 397

9  F.3d 1181, 1183 (9th Cir. 2005); Bennett v. King, 293 F.3d 1096, 1098 (9th Cir. 2002).

10    The PLRA exhaustion requirement is not jurisdictional but rather creates an

11  affirmative defense.  See Jones v. Bock, 549 U.S.199, 216 (2007) ("[I]nmates are not required to

12  specially plead or demonstrate exhaustion in their complaints."); Wyatt v. Terhune, 315 F.3d

13  1108, 1117-19 (9th Cir. 2003).  The defendants bear the burden of raising and proving the

14  absence of exhaustion.  Wyatt , 315 F.3d at 1119.  When the district court concludes that the

15  prisoner has not exhausted administrative remedies on a claim, "the proper remedy is dismissal

16  of the claim without prejudice."  Id. at 1120.  See also Lira v. Herrera, 427 F.3d 1164, 1170 (9th

17  Cir. 2005).  On the other hand, "if a complaint contains both good and bad claims, the court

18  proceeds with the good and leaves the bad."  Jones, 549 U.S. at 221.

19    Here, the court concludes that plaintiff properly exhausted his administrative

20  remedies with respect to his Eighth Amendment claim in connection with defendant Dr.

21  Athanassious' catheterization of plaintiff.  As the Ninth Circuit Court of Appeals has explained,

22  "[t]he primary purpose of a grievance is to alert the prison to a problem and facilitate its

23  resolution, not to lay groundwork for litigation." Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th

24  Cir. 2009). See also See Jones, 549 U.S. at 219 (citing Johnson v. Johnson, 385 F.3d 503, 522

25  (5th Cir. 2004) ("We are mindful that the primary purpose of a grievance is to alert prison

26  officials to a problem, not to provide personal notice to a particular official that he may be sued;

the grievance process is not a summons and complaint that initiates adversarial litigation.")).

In his inmate appeal, Log No. 06-1947, plaintiff described the catheter incident in great detail.  There, he wrote:

> I started to have a problem urineating [sic].  Dr. Calvo ordered an in-and-out catheter but the nurse in B-1 was not able to get it in.  About one hour later Dr. Calvo had me sent up to B-2 surgery to have Dr. Athanassious try to put a catheter into me.  I didn't want this doctor to do it after everything he has put me through.  So I laid on the gurney and then he started to put the tubing into my penis.  As he did I screamed out in severe pain and told him to stop.  [H]e would not he just kept trying to push it in.  I was pleading with him to stop and to stop holding my penis so tight it was hurting me.  He then told me to shut up that I was acting like a baby and that he was only using a 20 gauge.  The whole time M.T.A. Maxwell was holding me down.  It hurt so bad that tears were running down my face.  He said that he did 5 that day or every day I'm not sure something along those lines.  When he was done I told him urine was coming out from the side of my penis.  He said don't worry about it.  I asked him why he hurt me like he did.  He would not answer me.  He just walked out of the room.  I could hardle [sic] move after that.  When I got back to my room the only thing I could do was just stand there in one place moaning and groaning.  It felt like I was on fire between my legs.  It was burning so bad after about 1 hour of this Dr. Calvo had the nurse to get that catheter.  It did feel better but every time I went to the bathroom it would burn real bad, and when the nurse pulled it out blood came out.  I bled for about three day[s] after that.

(Pl.'s Mem. of P. & A. Ex. F.)

Defense counsel argues that plaintiff did not exhaust his administrative remedies with respect to his catheterization claim prior to filing suit because plaintiff only included his allegations with respect to that claim in his director's level administrative appeal and did not do so in his administrative appeals at the first or second levels of review.  In support of the argument, counsel cites the decision in Sapp v. Kimbrell, 623 F.3d 813 (9th Cir. 2010).  In Sapp, the plaintiff filed an inmate appeal related to the medical care he had received for a skin condition.  At the second level of administrative review, he raised an issue related to medical care for an eye condition.  Prison officials screened out the appeal and explained that plaintiff was required to raise the issue of his eye condition in a separate administrative appeal, starting at

1   the first level of administrative review.  Under those circumstances the Ninth Circuit held that

2   "[t]his screening was proper; an inmate must first present a complaint at the first level of the

3   administrative process."  Id.

4           The instant case is distinguishable from Sapp.  Here, plaintiff first described the

5   catheter incident in his administrative appeal at the director's level of review.  The director's

6   level of review denied plaintiff's appeal without addressing the catheter incident.  Unlike in

7   Sapp, however, prison officials did not "screen out" plaintiff's appeal as improperly presenting

8   the allegations regarding his catheterization nor did prison officials inform plaintiff that he

9   needed to raise those allegations in a separate administrative grievance, starting at the first level.

10  In fact, at the conclusion of the director's level of review decision, prison officials specifically

11  informed plaintiff that "[t]his decision exhausts the administrative remedy available to the

12  appellant with CDCR."  (Def.'s Reply Foston Decl. Ex. A.)  That the director's level decision did

13  not address plaintiff's claim with respect to his catheterization is no fault of plaintiff.  Plaintiff's

14  obligation to pursue administrative remedies persists only if some remedy remains available to

15  him.  See Brown v. Valoff, 422 F.3d 926, 935 (9th Cir. 2005) ("a prisoner need not press on to

16  exhaust further levels of review once he has either received all 'available' remedies at an

17  intermediate level of review or been reliably informed by an administrator that no remedies are

18  available.").  Here, the director's level decision informed plaintiff that no further relief would be

19  available to him through the administrative appeals process and that he was required to do more.

20          As noted above, the defendant has the burden to raise and prove the affirmative

21  defense of failure to exhaust administrative remedies.  See Jones, 549 U.S. 216; Wyatt, 315 F.3d

22  at 1117-19.  Defendant Dr. Athanassious has not carried his burden in this instance.

23  Accordingly, defendant Athanassious' motion for summary judgment based on plaintiff's alleged

24  failure to exhaust his administrative remedies with respect to his claim that he was denied

25  adequate medical care in connection with his catheterization should be denied.

26  /////

**CONCLUSION**

In accordance with the above, IT IS HEREBY RECOMMENDED that defendant Dr. Athanassious' motion for summary judgment be granted in part and denied in part as follows:

1.   Defendant Dr. Athanassious' motion for summary judgment on plaintiff's Eighth Amendment inadequate medical care claim in connection with the medical care provided for his finger injury (Doc. No. 57) be granted; and

2.   Defendant Dr. Athanassious' motion for summary judgment based on plaintiff's alleged failure to exhaust his administrative remedies with respect to his Eighth Amendment inadequate medical care claim in connection with his catheterization (Doc. No. 57) be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 8, 2011.

Dale A. Drozd
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:9
rodg2269.57(2)

23